

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SME:KTF/BW/DIB
F. #2024R00288

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 21, 2025

By ECF

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Timothy McCormack
              Criminal Docket No. 24-490 (LDH)

Dear Judge DeArcy Hall:

      The government respectfully submits this letter in advance of the sentencing of defendant Timothy McCormack ("the defendant" or "McCormack"), which is scheduled for January 21, 2026 at 11:00 a.m. For the reasons set forth below, the government respectfully submits that a term of imprisonment within the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 41 to 51 months' incarceration is appropriate in this case. This range balances the seriousness of the defendant's crime and the need for both specific and general deterrence of like behavior.[1]

I.     Background

      Legal sports betting companies, such as Betting Company #1 and Betting Company #2 (collectively, the "Betting Companies"), operate both brick-and-mortar (or "retail") sportsbooks and mobile applications. See October 24, 2025 Presentence Investigation Report ("PSR") ¶ 9. The Betting Companies offer a range of betting options, including, as relevant here, money line wagers and proposition (or "prop") bets. Id. ¶ 10. A money line bet is a bet on a game's outcome. Id. n. 1. A prop bet is a bet placed on an individual player's performance or a specific statistical aspect of a game, rather than on the game's final outcome. Id. n. 3. One version of a prop bet is an over/under bet. An over/under bet is a bet that a certain player (or team) will accumulate more (i.e., the "over") or fewer (i.e., the "under") of a given statistic than the line set

---

[1] The government intends to submit a proposed Order of Restitution within 90 days of the sentencing date. See 18 U.S.C. §3664(d)(5).

by sportsbooks. Id. ¶ 10. In the basketball context, a bettor can bet that a specific player will go over or under on any number of statistical categories, such as, among others, points, rebounds, assists, blocks, steals and three-pointers. The Betting Companies generally set the lines for over/under prop bets in accordance with a player's average performance to date. For example, if, over the course of the season to date, a player is averaging 20 points, 10 rebounds and 5 assists per game, the over/under line for the next game will, most likely, be in the vicinity of 20 points, 10 rebounds and 5 assists. Bettors can then bet either that the player will outperform and go "over" these statistical averages or underperform and go under them. Either way, the bettors' odds of success are generally 50-50. The Betting Companies' lines for individual player prop bets are also based on the assumption that the player will play approximately the same number of minutes in the game as he plays on average. The Betting Companies also allow users to place parlay bets, which are bets comprised of two or more individual bets, each of which must be successful in order for the overall parlay bet to be successful. Id. n. 2.

Since at least March 2023, the defendant participated in a sweeping conspiracy to place fraudulent wagers relating to National Basketball Association ("NBA") games based on material, non-public information relating to those games or to certain players' performances in those games. The defendant individually placed tens of thousands of dollars' worth of fraudulent wagers through the Betting Companies on NBA games in March 2023, January 2024 and March 2024, among others that the government continues to investigate.

### The March 23, 2023 Game

On March 23, 2023, the Charlotte Hornets played the New Orleans Pelicans (the "March 23 Game"). Id. ¶ 33. Prior to the game, Terry Rozier ("Rozier"), who at the time was a starter for the Hornets, told his friend Deniro Laster ("Laster") that he was going to be exiting the game prematurely and not returning. Rozier provided this information to Laster for the purpose of enabling Laster to place wagers based on this information. Laster then sold that non-public—and highly material—information to Marves Fairley ("Fairley") and another co-conspirator, who agreed to pay Laster approximately $100,000 for the information. Fairley, in turn, shared the information with Shane Hennen ("Hennen") and others, so that they could place "under" bets on a number of Rozier's statistical categories. Hennen then shared the information with a network of individuals, known as "straw bettors," with instructions to place bets on his behalf—and with an agreement that they would give Hennen a majority of the profits from their successful bets. Among others, Hennen shared that information with Long Phi "Bruce" Pham ("Pham"), who in turn shared that information with the defendant. On October 16, 2025, Rozier, Laster, Fairley, Hennen and others were charged with wire fraud conspiracy and money laundering conspiracy in connection with this scheme. See Indictment, United States v. Earnest, et al., 25-CR-323 (E.D.N.Y 2025). Fairley, Hennen and their network of straw bettors, which included the defendant, placed over $200,000 in bets on Rozier's unders, knowing that they were in possession of material, non-public information regarding Rozier's performance that the Betting Companies and other sportsbooks and public did not know.

The defendant placed approximately six wagers relating to this game at both a retail sportsbook operated by Betting Company 2 and through Betting Company 2's online application. See PSR ¶ 4. The wagers totaled approximately $23,726 and were all "under" bets on Rozier. For

example, the defendant placed an $8,000 "under" bet on Rozier's points and three "under" bets totaling $12,600 on Rozier's points, rebounds and assists. The defendant made these bets knowing that Rozier planned to exit the game early and with an understanding that such bets would be successful. Rozier exited the March 23, 2023 game after playing just nine minutes and all of the defendant's bets described above were successful, resulting in a payout totaling approximately $53,887. Id. ¶ 33. The defendant stipulated to engaging in this fraudulent conduct in his plea agreement. See Gov't. Ex. 1 at ¶ 2.[2]

The Jontay Porter Games

1. The January 26, 2024 Game

Jontay Porter ("Porter") was an NBA player who played on the Toronto Raptors during parts of the 2023-2024 NBA season. After Porter amassed a substantial gambling debt to Ammar Awawdeh ("Awawdeh"), Awawdeh encouraged Porter to clear his debt by withdrawing from a game early so that Awawdeh and others could place "under" bets relating to Porter's performance. See PSR ¶ 13. Porter ultimately agreed to prematurely exit the January 26, 2024 game between the Toronto Raptors and the Los Angeles Clippers (the "January 26 Game") and did, in fact, exit after playing just four minutes, citing a purported eye injury. Id. ¶ 15.

The defendant, who was a longtime friend of Awawdeh's, knew that Porter planned to exit the January 26 Game prematurely. Capitalizing on that information, the defendant, using Betting Company 1's mobile application, placed a $7,000 four-leg "under" parlay bet on Porter's points, rebounds, assists and three-pointers made. Id. ¶ 16. The bet was successful and the defendant won $40,250, netting a profit of $33,250. Id. ¶ 16. In addition, one of Awawdeh's relatives and a co-conspirator placed a $10,000 three-leg "under" parlay bet on Porter's assists, steals and three-pointers made. Id. ¶ 16. The bet was successful and the co-conspirator was paid $85,000 by Betting Company 1, netting a profit of $75,000. Id.

2. The March 20, 2024 Game

Porter and Awawdeh repeated the scheme on March 20, 2024, when the Toronto Raptors played the Sacramento Kings (the "March 20 Game"). Porter again agreed to exit the game prematurely citing a purported injury and did, in fact, exit the game after playing just three minutes. Id. ¶ 21. Prior to the game, Porter, Awawdeh, Pham, the defendant and another co-conspirator, Mahmud Mollah, agreed to place "under" prop bets on Porter's performance. Id. ¶ 18. They also agreed on a profit-sharing agreement whereby Porter, Awawdeh, Pham and Mollah

---

[2] The Indictment in United States v. Earnest, et al. also describes fraudulent wagers placed on a March 24, 2023 game between the Portland Trail Blazers and the Chicago Bulls. As noted in paragraph 47 of the Indictment, the defendant and Pham, acting at Hennen's direction, placed at least $32,000 in successful bets through the Betting Companies based on the non-public information they possessed regarding the Trail Blazers performance in that game. These successful bets won approximately $48,000, netting a profit of approximately $16,000.

3

would each receive 24% of the profits from their successful bets and the defendant would receive 4%. Id.

The defendant placed an $8,000 "under" bet on Porter's rebounds through Betting Company 1, which was successful and paid out $44,000, netting a profit of $36,000. Id. ¶ 22. In addition, the defendant placed a series of "under" bets on Porter through Betting Company 2 totaling approximately $4,598, all of which were successful and paid out approximately $12,969, netting a profit of approximately $8,371. Mollah placed numerous "under" bets through Betting Company 1 on Porter's performance totaling approximately $101,900. Id. Though all of Mollah's bets were successful, Betting Company 1, suspecting suspicious activity, did not make payments in connection with all the bets. Id. ¶ 23. Nevertheless, Mollah's successful wagers totaling approximately $101,900 would have yielded a total payout of approximately $1,191,525.

Shortly after the March 20 Game, the government began investigating the suspicious betting surrounding the January 26 Game and the March 20 Game. After the defendant and his co-conspirators Porter, Awawdeh, Pham and Mollah learned about the government's investigation, they jointly agreed to delete incriminating content from their phones. Id. ¶ 25. The defendant stipulated in his plea agreement that he in engaged in conduct constituting obstruction of justice. See Gov't. Ex. 1 at ¶ 2.

On June 4, 2024, the defendant, along with Awawdeh, Mollah and Pham, were charged by complaint with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. See ECF No. 1. On January 16, 2025, the defendant pled guilty to a one-count information charging conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. See ECF No. 64. The Court accepted the defendant's guilty plea on February 19, 2025.

II. Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]

4

      (C) to protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a).

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

### III. The Guidelines Calculation

The government agrees with the Guidelines set forth in the PSR, see PSR ¶¶ 52-62, and as set forth below:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. §§ 2X1.1(a), 2B1.1(a)(1)) | | 7 |
| Plus: | Loss exceeds $1,500,000 (U.S.S.G. § 2B1.1(b)(1)(I)) | +16 |
| Plus: | Substantial part of the scheme committed outside U.S. (U.S.S.G. § 2B1.1(b)(10)(B)) | +2 |
| Plus: | Attempted obstruction of justice (U.S.S.G. § 3C1.1) | +2 |
| Less: | Zero-point offender (U.S.S.G. § 4C1.1(a)) | -2 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| Total: | | <u>22</u> |

The defendant is in criminal history category I. Id. ¶ 66. Offense level 22 and criminal history category I yield a Guidelines sentencing range of 41 to 51 months' imprisonment.

### IV. A Sentence Between 41 to 51 Months' Imprisonment is Appropriate

The government respectfully submits that a sentence within the Guidelines range of 41 to 51 months' incarceration is sufficient, but not greater than necessary to achieve the goals of sentencing. Such a sentence would adequately take into consideration the relevant Section 3553(a) factors, in particular the nature and seriousness of the defendant's fraudulent scheme, the need to promote respect for the law, and the need to specifically deter the defendant and generally deter the public from engaging in similar fraudulent betting schemes in the future.

A. <u>Analysis</u>

Since sports betting was federally legalized in 2018, its presence in the American sporting and entertainment landscape has become ubiquitous. Beyond the Betting Companies, there are scores of other legal sportsbooks, with both online and retail presences. Each of the major U.S. professional sports leagues has entered official partnerships with various betting companies. Numerous arenas and stadiums throughout the country have sportsbooks located within the buildings. Sports-themed television networks have programs focused entirely on sports betting and televised sporting events are rife with advertisements for sportsbooks. Put simply, since its federal legalization, betting has become a commonplace feature of how many fans interact with sports entertainment.

The integrity of sports entertainment is predicated on the bedrock principle that the outcome of the game, and the players' performances within the game, is not predetermined. There is no script and anything can happen. Underdogs can beat favorites; game-changing performances can come from anyone, at any time and in any form; teams can come back from large deficits and long odds to prevail. There are countless ways in which sports are unpredictable, and this unpredictability undoubtedly contributes heavily to the excitement and enduring appeal of sports to the American public. When this core tenet is violated—when players engage in conduct that undermines the unpredictability of the game—the integrity of the sport is corrupted and the entire product becomes tainted. Historical sports rigging scandals have left an indelible mark on American history precisely because sports rigging is deeply antithetical to the very nature of sports entertainment.

Relatedly, modern sports betting is predicated on the principle that sportsbooks set their lines based on the entire mix of relevant public information. In this way, the sports betting industry operates similarly to the stock market, and betting lines, just like stock prices, are set in consideration of the publicly available information related to a player's expected performance. Bettors who are in possession of non-public information—such as a player's plan to leave a game early—can exploit this information by placing "under" prop bets and, in so doing, defraud the sportsbooks, which accept the users' bets based on the agreement that users are not betting while in possession of material, non-public information. Likewise, a conspiracy to defraud sportsbooks through a player's contrived early departures has the collateral effect of harming members of the public who took the opposite side of the bet.

As highlighted above, the defendant was a member of a conspiracy to place fraudulent wagers at sportsbooks based on the co-conspirators' possession of non-public information. Though the defendant was not the primary architect or leader of the fraudulent scheme, and largely took direction from his co-conspirators, he nevertheless played an integral role in this conspiracy. Because the defendant was a longtime bettor, he had high betting limits and was able to place large wagers. For this reason, the defendant was particularly valuable to the conspiracy, which needed a network of bettors to execute the scheme on a large enough scale to reap substantial financial rewards. In addition, the defendant was directly involved in the planning and execution of the fraudulent bets on the January and March 2024 Porter games described above. The defendant was longtime friends with Awawdeh and Pham, who worked directly with Porter to plan and orchestrate his rigged performances. The defendant was part of the negotiations with

6

Porter and traveled with Awawdeh, Pham and Mollah to a sportsbook operated by Betting Company #1 in Atlantic City to place tens of thousands of dollars' worth of bets on the March 20 Game. A photograph showing the defendant (in the black baseball hat), Awawdeh (in the red hooded sweatshirt), Pham (seated in the back) and Mollah (in the foreground in a gray hat) at the casino shortly before they began placing their fraudulent wagers is reproduced below:



The defendant's criminal conduct was undoubtedly serious. The scheme undermined the core principle of unpredictably that is integral to the public's faith in sports. The defendant and his co-conspirators—motivated by nothing more than greed and the desire to make a quick and undeserved windfall—have tarnished the public's faith in the integrity of national sports and the sports-betting process. In addition, the defendant's criminal conduct was not an isolated incident. After first participating in the conspiracy in March 2023, the defendant engaged in the same pattern of criminal behavior on at least two more occasions approximately a year later, in January and March 2024. For his role in the scheme, the defendant directly profited at least $51,294, as reflected in the Court's previously-entered Order of Forfeiture. See Id. ¶ 123. A substantial period of incarceration is needed to reflect the seriousness of the defendant's criminal conduct and to specifically deter the defendant from reengaging in further criminal conduct. Further, in light of the relative nascency of legalized sports betting on a nationwide scale, it is critical for the purposes of general deterrence that the Court send a strong message that performance rigging and fraudulent betting are serious crimes that will be punished accordingly.

Accordingly, for these reasons, the government submits that a sentence within the Guidelines range of 41-51 months is appropriate.

IV.    Conclusion

For the reasons set forth above, the government respectfully submits that a sentence within the Guidelines range of imprisonment 41 to 51 months' imprisonment is appropriate.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:  *Benjamin Weintraub*
Benjamin Weintraub
Kaitlin T. Farrell
David I. Berman
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (LDH) (by ECF)
       Jeffrey Chartier, Esq. (by ECF)
       U.S. Probation Officer Nicole Gervase (by Email)